COMPANY "A" FIRST REGIMENT NORTH DAKOTA NA-
    TIONAL GUARD TRAINING SCHOOL, a Corporation, Re
    spondent, v. EDMUND A. HUGHES, Appellant.

(205 N. W. 722.)

**Trover and conversion — demand not essential in case of tortious taking of property.**

1. In an action in conversion, where the evidence goes to establish an original tortious taking of the property converted it is not essential to make or prove a demand for a return of the property.

**Trial — if plaintiff's evidence points to but one conclusion, there is no question to be presented to the jury.**

2. Where the evidence offered to sustain plaintiff's contention upon a question of fact in a case, is substantial, and is admitted, or is not disputed or

Note.—(1) Necessity of demand and refusal in action for trover and conversion, see 26 R. C. L. 1122; 4 R. C. L. Supp. p. 1699; 5 R. C. L. Supp. 1441.

(3) On competency of witness to testify to property values, see 11 R. C. L. 638; 2 R. C. L. Supp. 1292; 5 R. C. L. Supp. 612.

(4) As to measure of damages in action of trover as to value of property, see 26 R. C. L. 1148 et seq.

controverted by substantial evidence in the case, and plaintiff's evidence and the inferences, if any, which fairly and reasonably may be drawn therefrom, point to but one conclusion, and is of such a character that fair and reasonable minds could not differ as to the conclusion to be reached therefrom, there is no question of fact or issue of fact upon such question to be submitted to the jury.

**Evidence — witness having charge of property for four years, and who had knowledge of its condition and cost of replacement, held competent to testify to reasonable value thereof; evidence of value held properly admitted.**

3. A witness who has had charge of personal property for upwards of four years, immediately prior to the taking by another, who had seen the property frequently during that time, had checked it over a number of times, who had knowledge of its condition, its state of repair, its usability, its serviceability, the cost of replacements, who knew or had informed himself of the cost of such property, and who testified he knew the reasonable value of the property at the time and place of the taking thereof, is competent and qualified, after such facts are laid before the jury, to testify to the reasonable value of such property.

**Trover and conversion — measure of damages reasonable value of property at and place of conversion, in absence of market.**

4. In the absence of a market therefor, the measure of damages for the conversion of personal property is the reasonable value thereof at the time when, and at the place where, said property is converted.

**Appeal and error — on verdict awarding unreasonable damages for conversion of personal property, new trial may be awarded on appeal.**

5. For reasons stated in the opinion, it is *held*, that the verdict in the instant case is excessive and that a new trial must be had unless the plaintiff will consent to a remission of the amount stated in the opinion.

Opinion filed October 28, 1925.

Appeal and Error, 3 C. J. § 608 p. 710 n. 73; 4 C. J. § 2531 p. 642 n. 22; § 2830 p. 844 n. 66; § 2833 p. 848 n. 35; § 3136 p. 1138 n. 63. Constitutional Law, 12 C. J. § 217 p. 785 n. 63. Corporations, 14a C. J. § 1858 p. 93 n. 96. Damages, 17 C. J. § 465 p. 1122 n. 41. Evidence, 22 C. J. § 680 p. 575 n. 49; p. 576 n. 51; § 681 p. 577 n. 73; p. 578 n. 74. Trial, 38 Cyc. p. 1534 n. 34; p. 1536 n. 36. Trover and Conversion, 38 Cyc. p. 2033 n. 78; p. 2083 n. 13; p. 2092 n. 56; p. 2093 n. 58; p. 2094 n. 61.

Appeal from the District Court of Burleigh County, *Wolfe,* Special J.

Modified and affirmed.

*Newton, Dullam & Young* and *Zuger & Tillotson,* for appellant.

Where the damages are susceptible of ascertainment by calculation, and the jury returns an inadequate or excessive amount, it is the duty of the court to grant unconditionally a new trial for the inadequacy of the verdict, or, if excessive, a new trial unless plaintiff will consent to a reduction of the amount given by the jury. Morgan v. King, 28 W. Va. 1, 57 Am. Rep. 633.

To constitute conversion there must be a positive tortious act, a tortious detention of personal property from the owner, or its destruction or the withholding of possession under a claim of title inconsistent with that of the owner. 8 Wait, Act. & Def. 1194; Bolling v. Kirby, 90 Ala. 215; 24 Am. St. Rep. 789.

Trover will lie only where the defendant is guilty of a conversion, which implies a wrongful disposition, appropriation, wasting, destruction or withholding of the property. The essential element of a conversion is malfeasance. Central R. Co. v. Lampley, 76 Ala. 357, 52 Am. St. Rep. 334.

It is error for the judge in instructing the jury: 1. To assume the existence of material facts which are in issue by the pleadings and which are controverted upon the evidence. 2. To assume the existence of material facts which there is no evidence tending to prove. The former species of error is aggravated where the judge assumes the existence of all the facts in controversy and leaves nothing for the jury to determine. 2 Thomp. Trials, p. 1646.

The right of the trial court to speak of facts as established in charging the jury, must stop where in any reasonable view of the evidence there is room for debate as to where the truth lies. Cupps v. State, 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.

*Theodore Koffel, F. O. Hellstrom* and *Knauf & Knauf,* for respondent.

The court in review in deficiency of the evidence to sustain a verdict will consider the evidence most favorably to the successful part. Heidner v. Germscheid, 171 N. W. 208.

The law requires certainty as far as possible and in absence of speculation it does not, however, require the impossible or the unreasonable. Sickerson v. Sinclair, 140 N. W. 241.

Proof of cost is sufficient in connection with the condition of the property where there is no market value. 23 N. Y. Supp. 1008.

If there is no local market a single sale, opinion of witness and general understanding are competent to establish the value. 77 S. W. 410.

Where upon previous appeals, this court has held the evidence sufficient to support a verdict, such holding becomes the law of the case, and upon a subsequent appeal, where the facts developed are substantially the same, the law of the case will control. Dubs v. N. P. R. Co. 199 N. W. 191.

Questions fairly raised and decided on a former appeal in the same action are not open for consideration on a subsequent appeal, as such decision on the first appeal, whether right or wrong, became and is the law of the case. Schmidt v. Beiseker, 120 N. W. 1096.

Pugh, District Judge. Upon a former appeal in this action from a judgment entered upon the verdict of a jury, the judgment so entered was reversed and the case remanded for a new trial. Company A. v. Hughes, 49 N. D. 626, 193 N. W. 144. A new trial, in accordance with said mandate, was had in the district court of Burleigh county, before a jury, resulting in a verdict in favor of the plaintiff in the sum of $6,500. Upon this verdict judgment was duly entered. A motion for new trial was made in the court below, and denied. The case is again here upon an appeal from said judgment, and said ruling.

The facts developed upon the second trial are substantially in accord with the facts shown upon the prior trial, a careful and concise statement of which will be found in the former opinion. (Company A. v. Hughes, supra.)

The numerous assignments of error present for our consideration three questions, which we will discuss in what we believe to be the order of their importance.

1. At the close of the evidence, after some discussion between court and counsel, the trial judge announced that he would instruct the jury that upon the record a conversion had been shown, and he did instruct the jury that "upon the evidence as given before you here in this case that as a matter of law, what the defendant Mr. Hughes did in relation to this personal property or so much of it as you shall find

was there October 1st, 1917, amounted in law to an unlawful conversion of that property and that as against Mr. Hughes, the plaintiff in this action is entitled to a verdict at your hands for such damages as the plaintiff may have shown it has suffered by reason of that unlawful taking."

It is contended by the appellant that the evidence is insufficient to support a verdict of conversion against him, and that the state of the evidence at the close thereof was not such as to warrant the trial court to take the question of the fact of conversion from the consideration of the jury and to virtually direct a verdict for the plaintiff thereon.

Before searching the record in this case to ascertain the state of the evidence upon this question, we are reminded that the plaintiff is a private corporation as distinguished from the military company known as Company A. That while members of the military company were also members of the plaintiff, that the plaintiff, and not the military company was the owner of the property in question.

Arrison v. Company D, 12 N. D. 554, 98 N. W. 83, 1 Ann. Cas. 368. Company A had been called into Federal service and was about to be entrained to be forwarded to Camp Greene, with the expectation of going over seas to take part in the World War then raging, and did actually entrain September 29, 1917. Company I and the Headquarters Company of the Second Regiment N. D. National Guards were also called to Federal service and were also about to be entrained to be carried to one of the training camps, to be ultimately sent over seas also to engage in said World War. Said companies did actually entrain October 1st, 1917. Thus the armory building in which this property was situated was vacated.

Defendant admits that he voluntarily became the custodian of the Armory on or about October 1st, 1917, and that he assumed such custody and control of said building, by virtue of a writing signed by Captain Murphy who appended to his signature the words "President Co. A. N. D. N. G. Training School Company" and attested by H. T. Murphy who wrote after his name "Acting Secretary," which writing is as follows:—

"Bismarck, N. D. Sep. 29, 1917.

"Mr. E. A. Hughes,

"Bismarck, N. D.

"This letter will be your authority to take full charge of the Armory Building on October 1st for and on behalf of Company A. N. D. N. G. Training School Company, until me or my successors return to Bismarck, N. D."

After receiving this writing, on or about October 1st, defendant admits he boarded up the windows of the building, and put a lock on and locked the doors of said building.

It is undisputed there was then contained in the building personal property of the plaintiff, consisting generally of the property set forth in the statement of facts hereinbefore referred to; and it is undisputed that the defendant then had such property in his custody and under his control. The defendant admits that shortly thereafter he took, or caused to be taken from said building, certain lockers and a water tank and delivered the same to the Beulah Coal Mining Company. Thereafter the building with its contents was rented to one O'Connor, who occupied it from about Christmas 1917 until the spring of 1920, when it was leased by defendant and another to a Mr. Copeland, who went into possession of the building about April 1st, 1920. O'Connor was paid $100 or $150 to give up possession of, and to take the personal property from, the building. There is some dispute as to the amount paid and who paid the money to O'Connor. We deem that immaterial in the consideration of this evidence. The record shows beyond cavil that the property was lost to the plaintiff, through the actions of the defendant.

With reference to the lockers, the defendant testified he had bought the lockers from Captain Murphy for the Beulah Coal Mining Company, agreeing to pay $180 therefor and that he removed them from the Armory pursuant to such sale. The record is silent upon the question of the authority of Captain Murphy, or any other officer of either Company A as a military organization, or of any officer of the plaintiff, as a private corporation, to dispose of the plaintiff's property in this manner, and it will be recalled that the writing of Captain Murphy giving to defendant charge of the property contains no reference to any such sale. It is not necessary for us to determine whether by his as-

signment as Captain of Co. A. Captain Murphy ipso facto became the president of the private corporation. That question is immaterial to the issues in this case, for, even though such assignment carried with it the presidency of the corporation, he would have no implied power to sell the property of this corporation. In other words, he would have, as president, only such authority to deal with said personal property as was expressly conferred on him by statute, charter or by-laws, or the Board of Directors acting within the scope of the powers conferred on them, or such as would be implied from express powers granted, or usage or custom, or the nature of plaintiff's business. 14a C. J. 93; 7 R. C. L. § 426 p. 438.

On the other hand while the proof shows the by-laws of the corporation have been lost, and though no proof of their contents was offered, the record conclusively shows that no such authority was even contemplated to be conferred upon any of its officials by the plaintiff, as appears from Article III of the Articles of Incorporation, received in evidence, as follows:—

"The existence of this corporation shall be perpetual unless sooner dissolved by a two-thirds majority of the members of this corporation then in good standing or by the mustering out of the service of Company A First Regiment North Dakota National Guard by the order of the Commander-in-Chief in which latter event any property belonging to this corporation shall be distributed to the stockholders as their interests may appear up to the face value of their stock and the balance to be divided equally between all members of Company A, First Regiment North Dakota National Guards, active at the time of being mustered out and all ex-members in good standing, who have served at least one full term in said Company A."

It is clear from the foregoing that Captain Murphy had no power or authority to sell defendant the lockers, or any other of the said personal property of the plaintiff; nor had he any right, power or authority to receive payment therefor or direct to whom the payment for such property should be made.

Having voluntarily become the custodian of this property, defendant's duty to plaintiff clearly was to exercise reasonable care and diligence to safely keep the same and redeliver it to the plaintiff. Instead of so doing, his testimony shows he personally unlawfully took and

converted at least a portion of it and permitted the use and unlawful taking and disposition of the remainder by those whom he placed in possession of it. "Inasmuch as the evidence goes to establish an original tortious taking, it is not essential under well settled legal principles to make or prove a demand for a return." Company A. v. Hughes, 49 N. D. 626, 193 N. W. 144; Rolette State Bank v. Minnekota Elevator Co. 50 N. D. 141, 195 N. W. 6.

Defendant claims, however, to have delivered the property remaining to John W. Murphy on the return of Murphy from the army and that he assumed no charge over the property, and did not interest himself as to the property after that time. Murphy returned to Bismarck on or about August 5, 1918, without his company. Company A was in France. The war in which it was engaged was in progress. The record does not disclose the status of Murphy at that time with respect to either Company A or the plaintiff, nor does it show the reason for his leaving his command in France and returning to his home. Hence so far as the record discloses, Murphy then had no power or authority to receive the property.

In every case tried to a jury there is a duty resting upon the trial court to determine what questions of fact are properly to be submitted to the jury, and to submit to them such questions as raise an issue of fact to be by them found. Where the evidence offered to sustain plaintiff's contention upon a question of fact in a case is substantial and is admitted by defendant, or is not disputed or controverted by substantial evidence in the case, and plaintiff's evidence and the inferences, if any, which may be fairly and reasonably drawn therefrom, point to but one conclusion, and is of such a character that fair and reasonable minds could not differ as to the conclusion to be reached therefrom, there is no question of fact or issue of fact upon such question to be submitted to the jury. Paulsen v. Modern Woodmen, 21 N. D. 235, 130 N. W. 231; Pirie v. Gillitt, 2 N. D. 255, 50 N. W. 710; State Bank v. Bismarck Elevator & Invest. Co. 31 N. D. 102, 153 N. W. 459; Clair v. Northern P. R. Co. 22 N. D. 120, 132 N. W. 776; John Miller Co. v. Klovstad, 14 N. D. 435, 105 N. W. 164; Gund v. Roulier, 108 Neb. 589, 188 N. W. 185, 190 N. W. 220.

Upon a careful consideration of the whole of the evidence in this case, we are unable to find any substantial evidence, controverting or

in conflict with that supporting plaintiff's contention relative to the conversion of the property in question. On the other hand the evidence tending to prove the conversion is substantial, is undisputed and uncontroverted by substantial legal testimony, and generally is admitted to be true by the defendant. The action of the trial court, in withdrawing from the jury consideration of the fact of conversion was proper and must be sustained.

2. Error is assigned upon rulings of the court upon objections by defendant to questions put to witnesses Welch and Brockopp relative to the value of the property in question. Upon the former appeal, we held the evidence to be insufficient to show the qualification of Captain Welch to testify to the value of a large number of the items of property involved in the case. It seems, too, that upon the former trial, the witness was allowed to testify to values upon the erroneous theory that as the witness was an official of the plaintiff, he could testify to values under the rule that permits an owner to testify to the value of his property. In the present record, the plaintiff has overcome the defects in the former trial, by having the witnesses detail the facts upon which their opinions of value are based. The testimony shows these witnesses, Welch and Brockopp had charge of this property for upwards of four years immediately prior to October 1, 1917. They had seen it frequently. They had checked it over a number of times during such period, they had knowledge of and testified to, the condition of the several items of property, they knew the state of repair of the property; the cost of replacement thereof, and in many instances they knew the cost of the articles. Witness Welch while Captain of Company A had bought some of this property for the plaintiff. He also had bought and used property in his home similar to some of the items of this property. It further appears from the evidence that there was no market for this kind of property in Bismarck. After adducing his evidence before the Court and jury, the witness, after having had his attention directed to the time and place of conversion, was asked what was the reasonable value of each item of property alleged to have been converted by defendant. The defendant objected to all of said questions on the grounds that no proper foundation had been laid, the witness had not shown himself qualified to answer and that the question did not call for the proper measure of damages. The

court overruled said objections. This ruling in our opinion was correct and is sustained. The foundation laid was sufficient upon which to receive the offered testimony of value. 22 C. J. pp. 575–578; 11 R. C. L. 638; Pollock v. Jordon, 22 N. D. 132, 132 N. W. 1000, Ann. Cas. 1914A, 1264.

The defendant's objection also challenges the correctness of the measure of damages sought to be proven. This point, not having been argued on appeal by defendant, either in his brief or orally, may be considered as waived. However, in passing it, we think the objection is not well taken. Comp. Laws, 1913, §§ 7168, 7183.

3. The defendant alleges and strenuously insists that the damages awarded the plaintiff in the verdict are so grossly excessive under the evidence and under the facts and circumstances of the case as to lead to the conclusion that the verdict was arrived at by reason of passion and prejudice and that to allow the verdict to stand as rendered will work a grave injustice to the defendant.

Inasmuch as no interest is included in the verdict, a computation made from the record in the case discloses the jury found the largest number of articles comprised in each item to have been converted, and placed thereon the highest values thereto testified by the plaintiff's witnesses. To illustrate respondent's contention we refer to the evidence as shown by the record of the numbers and of the values with relation to several of the principal items which plaintiff charges were converted, and which, it is plainly evident from the record and the verdict, were included in the finding of the jury, to-wit: the boiler, the piano, the chairs, the skates and the lockers.

It is contended that the boiler alleged to have been converted was not personal property in that it was attached to the armory building in which it was situated as a part of the heating plant of the building, formed a part of the building and was in fact realty. As we view the record, this question was not raised upon the trial, although counsel adverted thereto during the course of the trial. The case appears to have been tried on the theory that the boiler was personal property. Upon the record we are unable to determine that it was not personal property.

The evidence of value of the boiler was given by a former member of the plaintiff company whose experience with heating plants of this

character and their value consisted of work performed while his company was at Fort Lincoln. He says:—

"When we moved out to Fort Lincoln the plumbing was in very bad condition out there, and Major Wright, who was in command of the battalion requested 'A' Company to furnish a man or some men who were capable of handling the detail of inspecting plumbing and making an inventory of all of the parts necessary to put it in condition so the water would run and the heating and stuff like that, and it happened to be that I was detailed on that job. I was also instructed by Major Wright after I had made the inventory to get prices for that stuff because he was asking the government for money to get that plumbing and heating in good repair, and that was my detail at that time and I did that. Q. By plumbing do you mean steam fitting and everything that was connected with it? A. Everything that was connected with the plumbing and the heating in the building out at Fort Lincoln. Q. Did you do that? A. I did. Q. Did you make such a report to Major Wright? A. I did. Q. Did that include prices on new values and repairing old ones? A. I was to inform myself of the value and get prices on the different things that were needed, and that included mostly everything. Q. Did you inquire as to price of steam engines of the kind that was here in the armory? A. Well, boilers, not steam engines. Q. Boilers, I mean. A. Yes sir, I did. Q. And were you familiar then with the price of steam boilers of the kind and character of this one in the armory in the latter part of September, 1917? A. Practically the same thing, yes, sir."

Under objection he testified the value of this boiler was eight hundred dollars. On cross-examination he said the boiler was about six feet high and about four feet wide, had a fire box suitable for lignite coal, and a good sized door, rocker grates, and there were several draft connections and things like that. He did not remember the make of this boiler. It was made of some soft iron of some kind, he did not examine it.

Q. Do you know how long the boiler had been in use?
A. No, I can't say that.
Q. Do you know whether it was a sectional boiler or single unit?
A. I think it was a sectional boiler.

Q. How many sections?

A. I don't remember whether it was two or four.

Q. Do you know whether the sections were placed together side by side or horizontal?

A. Side by side."

The defendant called as a witness a former captain of Company A who testified that the boiler had been in use since 1907, that he purchased the boiler for the company. He further testified that on October 1, 1917, it was in very poor condition. Two sections were cracked, the building could not be heated with it in the condition it was in, and that its value was $125. Mr. Grambs, a plumber and steam fitter in business at Bismarck since 1894, testified the boiler was in bad condition and that it was worth one hundred dollars.

With reference to the piano Major Welch, Captain of Company "A" from May, 1913, to July, 1917, testified it was of the value of $1,000. He said the piano was the regular, upright piano in good condition with regular keys, it had an attachment to run it by an electric motor. On cross-examination he stated he did not know the make of the piano and that he did not know whether this was an inferior or a superior make of instrument. Another witness, O'Connor, produced by the plaintiff, testified the piano was not in usable condition, was marred more or less and was not used to play on. The undisputed testimony shows this piano was bought secondhand the year 1908 for $165, and that the motor was taken out and sold shortly thereafter.

Major Welch testified that on October 1, 1917, plaintiff had 300 folding chairs in sections of 4 in good repair. That they were worth $2 each chair. His predecessor, Captain Murphy, testified he had purchased the chairs for the company, that there were about 110 chairs and that on October 1, 1917, they were worth 60 cents each. Witness Cordner, also a member of Company "A" and a former director of the corporation, for the defense, testified there were not to exceed 125 chairs, and out of that number there were probably 25 unserviceable chairs.

Relative to the skates the testimony on the part of the plaintiff is that there were from 250 to 300 pairs worth from $6 to $6.50 per pair. Witness Cordner testified that the first lot of skates was purchased

secondhand the fall of 1914 or 1915 at 75 cents per pair. That thereafter new skates were bought from time to time at $2.50 or $2.75 per pair. This evidence is not disputed. Other witnesses testified the last lot of one hundred skates was purchased secondhand in 1916 at three dollars per pair.

Referring to the lockers, defendant Hughes testified the number taken by him from the armory was about 50. Witness Welch in answer to the question, "Do you know how many there were?" replied: "I cannot give you the exact number. There were at least 80." Witness Clough, who had held the offices of corporal, sergeant, and quartermaster of Company "A" and who, during the time the company was on the Mexican Border was custodian of the property, was asked: "You have testified as to lockers; how many of these were there, Mr. Clough?" He answered: "If I could count them now there would be 64 lockers." The testimony of witness Clough is substantially in accord with that given by the witness Welch upon the former trial of the case. The jury would not be warranted in finding a greater number than the evidence of plaintiff fairly establishes as converted by the defendant, and such number is not greater, in any event, than 64. Other evidence offered by plaintiff in relation to the number of lockers may be classed as conjectures. Plaintiff's witnesses testified the lockers were in good condition and were of the value of $20 each at the time of the alleged conversion. On the other hand witness Murphy testified the lockers were in very bad condition and were of the value of $1.50 each. He further testified, and his evidence in this respect is not disputed, that he purchased the lockers new in the fall of 1907 for the sum of $6.03 each.

There are similar discrepancies as to values regarding other items of property alleged to have been converted. It is unnecessary to cite further examples. These show plainly the wide divergence, not only as to the values placed on these articles, but as to the number of articles in each item or class. The verdict shows plainly that the jury took, for its computation, the highest values and numbers of articles testified to by plaintiff's witnesses, and disregarded the period of time the property was in use, the second hand condition of a large portion of it when acquired, and the cost when purchased; and did not, apparently, disregard such statements on the part of witnesses as amounted to

mere conjecture; all of which impels us to the belief that the verdict as rendered is the result of a misapprehension of the evidence in the case on the part of the jury, or that the jury was laboring under the disability of passion or prejudice in the rendition of it. We have referred in the foregoing to the cost price of articles or items of property, not that we depart from the established general rule that, in the absence of a market therefor, the measure of damages for the conversion of personal property is the reasonable value thereof at the time when, and the place where, said property is converted, together with the interest thereon; but, rather, to show the wide disparity between what the article or articles actually cost the plaintiff, and the values placed thereon by the witnesses and, evidently, allowed by the jury, as well as to determine the reasonableness or unreasonableness of the testimony of the witnesses.

It is true, and well established, that the credibility of witnesses and the weight to be given their testimony, as well as disputed questions of fact, are peculiarly within the province of the jury to determine, yet, where the values of personal property testified to by the witnesses and allowed by the jury, are so unreasonable, having consideration for the condition, use and wear of the property, and the actual cost thereof, as to shock the conscience of the court, it becomes our imperative duty, as a court, either equitably to adjust the amount of recovery or to grant a new trial of the action. Chapter 334, Sess. Laws, 1923, modifies the rule previously obtaining in this state with reference to the effect of excessive damages given under the influence of passion or prejudice upon the verdict of the jury in relation to the granting of a new trial. The statute now provides:

". . . 5. Excessive damages appearing to have been given under the influence of passion or prejudice. Where a new trial is asked for on this ground, and it appears that the passion and prejudice affected only the amount of damages allowed, and did not influence the findings of the jury on other issues in the case, the trial court on hearing the motion, and the supreme court on appeal, shall have power to order a reduction of the verdict in lieu of a new trial; or to order that a new trial be had unless the party in whose favor the verdict was given remit the excess of damages."

It appears that the passion and prejudice, if any, affected only the

amount of damages allowed. It is apparent, from a consideration of all of the evidence in the record, that the verdict of the jury is greater, by at least $2,500, than the evidence warrants, considering all of the evidence in the case in the light most favorable to the contention of the plaintiff. In other words, the evidence, considered and applied most favorably for the plaintiff, does not warrant and will not support a finding for the plaintiff of a greater sum than $4,000, including the interest which might have been allowed upon the actual damages shown by the evidence to have been sustained.

In view of the fact that this case has been pending for a considerable length of time and that two jury trials have been had, the court is reluctant to remand the case for a third trial, without giving to plaintiff an opportunity to avoid further vexatious delays.

It is therefore ordered that this action be remanded for a new trial upon the issues, unless the plaintiff shall, within fifteen days of the filing hereof, remit the sum of $2,500, thereby reducing the verdict and the judgment entered thereon, to the sum of $4,000, and that upon the making of said remittance by the plaintiff, as aforesaid, the judgment as so modified be affirmed. The remittitur is stayed during said fifteen days.

A rehearing has been had in this case, and upon the rehearing it has been urged that the judgment should be reversed on the ground that the verdict was not agreed to by all of the twelve jurors but only by the number required by the five-sixths jury statute, Chapter 333 of the Session Laws of 1923, and that such statute is unconstitutional and void. This question was not raised in the court below, nor was the judgment in any manner challenged on this account upon the original appeal to this court. The constitutionality of a statute, ordinarily, can not be raised for the first time in an appellate court, and there is even less reason for entertaining such a question when raised for the first time upon rehearing. 6 R. C. L. 95; 3 C. J. 710; 12 C. J. 785; Cooley, Const. Lim. 5th ed. 507; Ellison v. La Moure, 30 N. D. 43, 151 N. W. 988.

CHRISTIANSON, Ch. J., and BIRDZELL, J., and BERRY, Dist. J., concur.

JOHNSON and NUESSLE, JJ., being disqualified, did not participate; PUGH and BERRY, Dist. Judges, sitting in their stead.

BURKE, J. (dissenting). On former appeal of this action Company A v. Hughes, 49 N. D. 626, 193 N. W. 144, this court held "that witnesses who were members and directors of a corporation are not by virtue of that fact alone, qualified to testify to the value of property of the corporation, which is alleged to have been converted." That decision is the law of this case. Schmidt v. Beiseker, 19 N. D. 35, 120 N. W. 1096.

The evidence in this case is the same as the evidence in the former trial. The witnesses are the same except, that one Langley, who was one of the principal witnesses in the former trial, was not a witness in the last trial. The witness Major A. B. Welch was the principal witness in the last trial, and on pages 61 and 62 of the record when he is testifying as to his knowledge of values he is asked this question: "Now this knowledge is the same knowledge that you had when you testified in February 1922, is it not?" Ans. "Approximately the same." On page 72 of the record referring to his testimony in the former trial he is asked this question: "So you had the same knowledge as you had two years ago when this case was tried?" Ans. "Practically."

I am unable to find any testimony in the record justifying the statements in the majority opinion that the witnesses, Welch and Brocopp, had charge of the property involved in the action for upwards of four years. The evidence shows that the witness Welch knew very little about the property and did not have possession of it, as stated in prevailing opinion. On page 80 of the record Major Welch says: "I was in Canada in the summer of 1914 and I spent the winter in New York, I got back here sometime in the spring."

On page 58 of the record he states that: "Captain Wing was the Commanding Officer in charge of Co. 'A' when he left." On page 81 he stated: "We got back from the border February, 1917" and on page 78 of the record he states: "We were 16 months on the border."

In speaking of buying punching bags, on page 68, he states: "Why I bought them when I was in school, a member of a gymnasium class." Question. "Where?" Ans. "Puget Sound University, Tacoma, Wash-

ington." "You had been to school at the University before the first trial." Ans. "Yes, sir." On pages 11 and 12 of the record he states that he came to Bismarck in 1904 moved to Mandan in 1916 and is asked this question: "Have you been back here again after that?" Ans. "Not to live." So it appears that he did not live in Bismarck, that he spent the summer of 1914 in Canada, winter in New York city, getting back in the spring of 1915. He was 16 months on the border and at the University of Puget Sound, Tacoma, some of the time, he does not state how long, and that it was while there that he bought the punching bags, so it appears that he was away and out of the state for nearly all of the four years prior to October 1917 and that when in the state he lived in Mandan.

In April, 1917, he was made Captain of Co. "I" and Murphy was made Captain of Co. "A." Company "A" got back to Bismarck in the fall of 1918 and nearly all of the property was in the Armory until March 1920. It is claimed that since the former trial that Major Welch and the other witnesses have qualified as witnesses. Welch's qualifications as a witness on the subject of values are well illustrated in his testimony on the value of the piano. On page 77 of the record he is asked: "You are familiar with the fact that some brands of pianos can be bought for $150 to $175 whereas another piano which looked very much the same on the exterior will cost $1,000 to $1,200?" Ans. "Yes, sir." Question. "You don't know whether this was an inferior or superior make of instrument?" Ans. "No, sir." And yet he is permitted to testify that this piano was worth $1,000 on the first day of October, 1917, while the undisputed testimony shows, that it was bought second hand by Captain Murphy for $165 in 1907. He states that he further qualified himself by writing the piano companies for prices, but if he did not know the kind of piano it was, and whether it was an inferior or superior kind, how could he get accurate or competent information from any piano company?

On page 29 the witness Welch was asked this question: "You described a lot of papers, books, military drill manuals, did you know the price?" "Yes, sir." Objection was made to this testimony and the plaintiff's attorney, Mr. Koffel, states on page 30: "The reason I haven't gone any further was because so far as the last record shows there was nobody who could tell what was in that box." That, of

course, is the box referred to in Mr. Welch's testimony, on page 14: The box which Mr. Welch says "Sergeant Scharnowski filled with records, under his orders to deliver to the Adjutant General's Office." That was prior to the 1st day of October, 1917, and yet the witness is permitted to testify to the value of drill manuals, miscellaneous papers and books, which, according to the plaintiff's attorney's statement, might have been in the box sent to the Adjutant General's Office before the 1st of October, 1917.

The undisputed testimony shows that the water heater was rusted to a mere shell and could not be used, yet he testified that it was worth $75, because that is what he paid for one that he put in his house sometime or other, he does not say when. The plaintiff managed to get before the jury, under objections, what all the property would cost new and that is what the verdict is based on, which is not the measure of damages in conversion.

The majority opinion states that the defendant challenges the correctness of the measure of damages, and states that the point is not argued and is therefore waived, but that the point is not well taken.

The measure of damages is challenged in the third assignment of error which refers to page 29 of the record, and is not waived. On page 28 we find this testimony: "Now state whether or not you know what it cost to replace them here, on or about the first of October, 1917?" On page 29 he is asked: "What were their reasonable values, basing your opinion on the cost price of chairs, and the cost of replacing them, and the use to which they have been put and the condition of repair they were in on that day?"

It is objected to, no foundation laid, not the proper measure of damages or the values. The Court: "He may answer." Ans. "$2 a piece." Referring to the skates, Mr. Koffel states, page 101: "I want to show what was their value; he bought them at $3 and he has given the value at $6 or $6.50; I think it leaves the witness in a bad position; he ought to be permitted to explain that." The Court: "Well he may answer." The witness: "That was the price new skates would cost us." The Court: "You mean by that what?" Witness: "$6.50." Question: "The price of $6.50 is what new skates would cost you?" Witness: "Yes, sir."

The case was tried upon the theory that there was no market price

for the property in question in Bismarck on October 1st, 1917, but plaintiff's witnesses are asked this question (this particular question appears in the testimony of A. B. Welch on page 47 of the record); "And did you, or did you not know the price of articles of that kind here in Bismarck, on the first day of October, 1917?" Ans. "Yes, sir."

In overruling defendant's objection to the testimony of witness Brocopp on the value of the boiler of the heating plant, the objection being that no proper foundation has been laid, the witness hasn't shown himself qualified to express an opinion on this value and it doesn't call for the proper measure of value. The court said that the witness says: "that he is familiar with similar boilers at Bismarck and at that time, and while that would *refer to new boilers it seems to me that it qualifies him to express an opinion as to the value of this second hand boiler.* "He may answer." Ans. "$800." This testimony was taken under objection and was assigned as error on appeal.

On page 75 of the record witness Welch states: "I have written various houses regarding all of these articles—wholesale houses, asking them the prices, on October 1, 1917." Question: "On new goods?" Ans. "Yes, sir." This explains the excessive values fixed by plaintiff's witness and the excessive verdict of the jury. They are both based upon hearsay testimony, the admission of which under objection was error. The cost of new property is not the measure of damages under § 7168, Compiled Laws, 1913. The first subdivision being applicable to this case, viz.: "The value of the property at the time of the conversion, with the interest from that time."

Brocopp's testimony shows that he was not familiar with the property. In speaking of the boiler, on page 118, he says: "I didn't say I knew the make, I got prices on boilers and I didn't know what they were made of." On page 119 he says: "At that time I was getting prices on boilers and stuff and connections and other things, one thousand other things." If he was familiar with the property, he would have known that there were two big cracks in the boiler; that it had been used for ten years and was practically worn out, as testified to by Grambs and Murphy. Clough qualifies in the same way, basing his testimony on values of new property secured from wholesale houses.

No foundation was laid for the witnesses' testimony for the reason

310 NORTH DAKOTA REPORTS

that the information secured from wholesale houses was hearsay. Wigmore, Ev. § 719, p. 1137, states the rule thus: "If A sits in a merchant's office and listens to the terms accepted and rejected for a dozen articles, he acquires a first hand knowledge of value; but if he goes in and asks the merchant to tell the value of a given article, his knowledge is based on a belief in the truth of the merchant's assertion. In the former case, his knowledge is not based on hearsay. But in the latter case his knowledge is based on the hearsay assertion of another person, and therefore is inadmissible (under the principle of § 657)."

"When property has been used, evidence of the cost of replacing it with new, furnishes no measure of value for it. Section 127 California Jurisprudence; Merril v. Pacific Transfer Co. 131 Cal. 582, 63 Pac. 915; Re Slade, 122 Cal. 434, 55 Pac. 158."

"In Independent Linen Supply & Steam Laundry Co. v. Zakrowsky, 158 N. Y. Supp. 721, it was held that proof of the cost price of napkins when new was insufficient to support a judgment for conversion occurring seven months later, during which time they had been in use; that the measure of damages was their value at the time of the conversion, and damages based solely on proof of their value when new were excessive."

And in O'Neill v. Patterson, 26 Misc. 3, 55 N. Y. Supp. 617, it was held that proof of the value of household furniture when new was insufficient evidence of its market value at the time of its conversion four months later, so as to sustain a judgment for the conversion, where it had been, in the meantime, in constant use by tenants, and there was evidence merely that some of it had been lost or destroyed and the balance had somewhat deteriorated.

Also in Walsh v. New York City R. Co. 93 N. Y. Supp. 552, it was held that evidence of the cost of wearing apparel and of its condition after the accident is insufficient to support a judgment for damages thereto, in the absence of proof of its reasonable value, the amount of its depreciation, or its condition before the accident.

Burchinell v. Butters, 7 Colo. App. 294, 43 Pac. 459 (wrongful attachment) it was said: "The cost of replacing them might perhaps have been one method of arriving at the value, but it must have been

of the same kind of goods that had been in use for the same length of time and in the same condition, not new goods."

The property involved in this action was nearly all purchased by Capt. Murphy about the time the Armory was built in 1907. The evidence shows that it had hard usage and very little care. On page 60 of the record witness Welch is asked this question: "Well, the fact is that you did not put anyone in charge yourself?" Ans. "No, sir." This is shown by the testimony of the veteran Steven Welch, who states that he had a key from the time that the Armory was built. He was a member of the G. A. R. organization which organization put $300 in the Armory. They held their meetings there. He says: "I lived right across the road on the other side from the Armory and when they wanted to get in there, they would hunt me up and I would let them in." At the time Companies "A" and "I" left Bismarck for the war, he says: "The door was all knocked off and the locks weren't any good and I put a new lock on it."

Witness Welch is asked: "If the chairs were not loaned for a street dance and if they did not remain on the street for several days?" He said: "They were loaned for the street dance, and that he did not know whether or not they remained on the street."

The majority opinion reviews some of this evidence and states that it is apparent "that the jury found the largest number of articles in each item to have been converted and placed thereon the highest values testified thereto by the plaintiff's witness." It then reviews the testimony of Welch, Brocopp and Clough, and states that the other evidence that is evidence outside of the testimony of Welch, Clough and Brocopp might be classed as conjecture. If it was conjecture, to admit it under objections was error. The plaintiff's case must stand upon the testimony of the three witnesses named, and their testimony, "is so unreasonable as to shock the conscience of the court, so that it becomes its imperative duty to reduce the verdict in the sum of $2,500." This is an arbitrary reduction based upon no evidence. The court finds that the verdict is based upon the testimony of Welch, Clough and Brocopp, both as to the number of pieces of the property converted and the highest value placed thereon. The trial court admitted the evidence stating specifically that the information which Brocopp got on new boilers qualified him to testify as to the value of the old boiler. Since the

evidence was admitted as competent it was the duty of the jurors to consider it and to be guided by it if they believed it to be true. The admission of the evidence is error and the case should be reversed and a new trial granted.